## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |

Jordan Applegate; William Bartlett; Brian
Jacob Bilnoski; Block M Angels, LLC;
Randall Boll; Blake Bretz; Gustavo
Santucho Brinkman; Christopher Brugler;
Mario Adrian Burdman; George Burguillos;
John Byrde; Brian Cameron; Daniel Claps;
Daniel Clark; CRI Holdings, LLC; Downey
Vendors Inc; Jillian Dressel; Fad Tech LLC;
Fee; Tanner Fielding; Fortress Trust LLC;
Dylan Garland; Guilherme Amado Cerqueira
Gomes; Stephen Gray; Jonathan Guez;
Alexander Harris; Philip Herzog; Zachary
Hollinshead; Mary Holtzman; Imperial
Plaza, LLC; Kelly Inatomidebotoun;
Constance Aslinger Jacobs; Elijah Jerjerian;
Christopher Johnson; Daniel Johnson; Linda
Keller; Jared Kelly; Reeran Kim; KME
LLC; Benjamin Koppenhoefer; Faris Mali;
Tucker Michael McGrath; Charles Avant
Miller IV; Mojo Dialing Solutions, LLC;
Darragh Monaghan; James Noto; Brian
Overly; Timothy Parker; Elizabeth Parrish;
Walter Patterson; David Pera; Port 8333
Holdings Inc.; QuickieCoin NJ LLC; Kara

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification
number, are:  Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime
Digital, LLC (4528) (collectively, the "Debtors" or "Prime").  The Debtors' service address is 10845 Griffith
Peak Dr., #03-153, Las Vegas, Nevada 89135.

Rasmussen; David Ratcliffe; Aubyi Rekieh;
Roseberry Funeral Home, Inc.; Aldes Joseph
Rozas III; Idalia Rychlik; Martin Saenz;
Pedro Serra; Jeremy Showalter; Shanthi
Sivanandham; Dean Smith; Pavle Stojkovic;
Cranford Stoudemire; David Strause; The
Cody Harris Experience LLC.;Timberland
Holdings, LLC; Jason Todt; Jonathan
Towers; Dr. Louis Van Graan; Nicholas
Vlahos; Mykola Vrutsky; Vann Walters;
James Wikso; Ronald Williams,

Defendants.

# COMPLAINT

Plaintiff PCT Litigation Trust ("PCT" or "Plaintiff"),[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against each of the above-named Defendants, individually (each a "Defendant" and referred to individually as such herein), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Defendant plus interest, attorneys' fees, and costs. To the extent that a Defendant has filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estates (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j), and such rights are expressly reserved. Notwithstanding this

---

[2]    The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

reservation of rights, certain relief pursuant to section 502 of the Bankruptcy Code is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## INTRODUCTION

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter on August 14, 2023.  Most of Prime's customers suffered losses and have yet to receive any of the fiat or crypto owed to them.  But, between May 16, 2023 and the Petition Date,[3] Prime transferred to Defendant, by or on behalf of the integrator with whom Defendant had a customer relationship (the "Integrator"), the fiat and/or crypto as alleged below (the "Transfers").[4]

2.      Prime served two types of customers: integrators and end-users.

3.      Integrators, including the Integrator alleged here, were typically sophisticated crypto companies that contracted with Prime through various service-related agreements ("Integrator Agreements").  Integrators directly accessed services provided on Prime's platform through an Application Programming Interface ("API") provided to the Integrator.

4.      Integrators had their own customers (*i.e.*, the "End-Users") that did not directly procure Prime's services.  Rather, after satisfying "Know Your Customer" requirements with an Integrator, End-Users accepted or agreed to a user agreement with Prime (the "End-User

---

[3]     Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning Prime's non-insider preference period (the "Preference Period") was between May 16, 2023 and the Petition Date.

[4]     The Transfer amounts alleged and sought herein are net of any potential subsequent new value that Defendant transferred to Prime during the Preference Period, as determined by PCT and its retained expert.  Defendant bears the burden of providing any affirmative defenses to this action, including the subsequent new value defense.

Agreement"), making the customer an "End-User" of Prime.  End-User Agreements were presented to End-Users by an Integrator through the Integrator's system, which connected to Prime's platform through the API technology and services supplied to the Integrator by Prime.

5.    For each Defendant that was an End-User of Prime, a copy of each Defendant's respective End-User Agreement with Prime, if it has been located as of the time of filing, is attached hereto as Exhibit A.

6.    Each of the Transfers that PCT seeks to avoid by this action was transferred by Prime to or for the benefit of Defendant either: (i) as an End-User of Prime, or, (ii) if Defendant was not an End-User, by and on behalf of Integrator or Integrator's customer which was an End-User of Prime.[5]

7.    On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting Related Relief* [Docket No. 1086] (the "Distribution Order").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "Distribution Opinion").

8.    In its Distribution Opinion, the Court analyzed representative versions of Integrator Agreements and an End-User Agreement.  The Court held that these agreements "do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors."  *See* Distribution Opinion, at 25.

---

[5]    It is PCT's position the Transfers alleged herein that Prime made during the Preference Period were to or for the benefit of Integrator and, as such, are recoverable from Integrator.  PCT intends to rely on the claims asserted herein **only** to the extent that the Court may find that Integrator is not the proper party from which PCT should seek to avoid and recover the Transfers.  To that end, PCT intends to move to stay this adversary proceeding (this "Adversary Proceeding") against Defendant pending resolution of PCT's claims against Integrator.

9.      Because Prime's Integrator Agreements and End-User Agreements created a debtor-creditor relationship with Prime, the property that comprised the Transfers to Defendant consisted of estate property.

10.     Additionally, the funds which Prime's customers transferred to Prime were commingled to the extent that it is impossible for any party to specifically identify which funds were provided to Prime by any specific customer.

11.     The fiat that customers transferred to Prime was held by Prime in "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled fiat that customers (including Defendant if it was an End-User) transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations.

12.     Likewise, the crypto that customers (including Defendant if it was an End-User) transferred to Prime was held in "omnibus" digital wallets in vaults ("Vaults") maintained by Prime, in Prime's name, at Fireblocks LLC ("Fireblocks").  These omnibus digital wallets commingled the crypto that customers (including Defendant if it was an End-User) transferred to Prime with crypto from Prime's many other customers and with Prime's own crypto that it used for corporate operations and purposes.

13.     Prime attempted to keep track of the commingled fiat and/or crypto transferred by its customers by use of an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was poorly maintained and later intentionally corrupted by Prime.

14.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and/or crypto that customers (including Defendant if it was an End-User) transferred to Prime.

15.     The Court has found that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that "the fiat held by the Debtors is not traceable" and the "the hopeless commingling would not allow the cryptocurrency to be traced." *See* Distribution Opinion at 23–24, 27, 30.

16.     Likewise, the third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat and/or crypto that a specific Integrator transferred to Prime on behalf of its customers from the fiat and crypto provided by Prime's other customers or from Prime's own fiat and crypto. *See* Declaration of James P. Brennan (the "Brennan Decl.").[6]

17.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[7] holding more than 11,000 ETH that had been transferred by one of Prime's customers. Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet. *See id.* at ¶¶ 114–116.

18.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests. To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 117–122.

19.     Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases. To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created

---

[6]     A copy of the Brennan Decl. is attached as Exhibit B.

[7]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

> Q:    When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?
>
> A:    Yes.
>
> Q:    ***There were no wire transfers; right***?
>
> A:    ***Yes***.
>
> Q:    ***Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?***
>
> A:    ***Yes, there were no wire transfers***.

Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▮▮▮ Dep."), 164:22–165:10 (emphasis added).

20.    Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Prime's customers.

21.    Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace specific transfers that were made by any particular customer.  *See* Ex. B, Brennan Decl., ¶¶ 123–132.

22.    Prime's Transfers to Defendant during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

23.     Each of the Transfers that PCT seeks to avoid was made:  (i) to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime (*i.e.*, a creditor of Prime); (ii) on account of an antecedent debt owed by Prime to Integrator or to End-User; (iii) while Prime was insolvent; (iv) during the Preference Period; and (v) would allow Integrator or End-User to receive more than they would have received in a hypothetical chapter 7 liquidation. In short:  each of the Transfers to Defendant was a preferential transfer of estate property and avoidable under section 547 of the Bankruptcy Code.

24.     Regardless of whether Defendant was an End-User, each Defendant named herein received the avoidable Transfers of estate property, net of any potential subsequent new value, as determined by PCT and its retained expert

25.     As an End-User and/or transferee, Defendant received the Transfers either as: (i) the initial transferee of the Transfer or the entity for whose benefit the Transfer was made; or (ii) an immediate or mediate transferee of the initial transferee.

26.     Accordingly, the Transfers to each Defendant are avoidable under section 547, and also are recoverable under section 550, of the Bankruptcy Code.

27.     PCT brings this Adversary Proceeding pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Defendant, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.  Each of the Transfers to Defendant alleged herein is avoidable under section 547 of the Bankruptcy Code.  Pursuant to section 502(d) of the Bankruptcy Code, PCT seeks to disallow any and all claims filed or held by Defendant in these Chapter 11 Cases unless and until Defendant has relinquished to PCT all property owed to it.

28. During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Defendant that are avoidable and/or recoverable under the Bankruptcy Code. PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendant and, accordingly, reserves the right to amend this Complaint.

## **PARTIES**

29. Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644]. The Plan was consummated on January 5, 2024 (the "Effective Date").[8]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust. *See* Plan, § 6.21. The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn. *See id*. at § 1.118.

30. Defendant Fortress Trust LLC with a personal or business address of 112 North Curry Street, Carson City, NV, 89703, was either a (i) customer of Integrator and an End-User of Prime, or (ii) transferee that, by or on behalf of either Integrator or an End-User, received transfers

---

[8]   *See* Docket No. 694.

-9-

from Prime of $22,083,687.88 USD, net of potential subsequent new value, during the Preference Period.

31.     Defendant Fad Tech LLC, with a personal or business address of 545 Highway 309 N, Byhalia, MS 38611, was either a (i) customer of Integrator and an End-User of Prime, or (ii) transferee that, by or on behalf of either Integrator or an End-User, received transfers from Prime of $1,054,257.31 USD, net of potential subsequent new value, during the Preference Period.

32.     Defendant Jillian Dressel, with a personal or business address of 22885 Aspen Dr, Los Altos, CA 94024, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of $137,500.00 USD, net of potential subsequent new value, during the Preference Period.

33.     Defendant Nicholas Vlahos, with a personal or business address of Attn: Nicholas Vlahos, 3724 E San Pedro Pl, Chandler, AZ 85249, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 11.22162 BTC, net of potential subsequent new value, during the Preference Period.

34.     Defendant Jeremy Showalter, with a personal or business address of 17607 Northeast 31st Place, Redmond, WA 98052, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 6.90100 BTC, net of potential subsequent new value, during the Preference Period.

35.     Defendant Mojo Dialing Solutions, LLC, with a personal or business address of Attn: Davis Mangold, 5 Westmere Ave, Norwalk, CT 06853, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 6.38119 BTC, net of potential subsequent new value, during the Preference Period.

36.     Defendant Tanner Fielding, with a personal or business address of Attn: Tanner F, 400 Ridge Rd, Edmond, OK 73034, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 5.00000 BTC, net of potential subsequent new value, during the Preference Period.

37.     Defendant Kara Rasmussen, with a personal or business address of Attn: Kara Rasmussen, 149 Kingston Dr, Aurora, OH 44202, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 4.80175 BTC, net of potential subsequent new value, during the Preference Period.

38.     Defendant Christopher Johnson, with a personal or business address of 20244 Shipley Terrace, Apt 301, Germantown, MD 20874, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 3.61258 BTC, net of potential subsequent new value, during the Preference Period.

39.     Defendant Alexander Harris, with a personal or business address of 24B Ranch Road, Mount Maunganui 3116, New Zealand, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 3.45723 BTC, net of potential subsequent new value, during the Preference Period.

40.     Defendant Port 8333 Holdings Inc., with a personal or business address of Attn: Kgothatso Ngako, 1041 Warriors Street, Nellmapius, Pretoria, 0122, South Africa, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 3.29127 BTC, net of potential subsequent new value, during the Preference Period.

41.     Defendant Elijah Jerjerian, with a personal or business address of 823 Moorside Drive, Glendale, CA 91207, was a customer of Integrator and an End-User of Prime, and received

transfers from Prime of 3.08091 BTC, net of potential subsequent new value, during the Preference Period.

42.     Defendant Blake Bretz, with a personal or business address of 26268 East Long Avenue, Aurora, CO 80016, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 3.07407 BTC, net of potential subsequent new value, during the Preference Period.

43.     Defendant Pedro Serra, with a personal or business address of Attn: Pedro Serra, 17 Calle Inga, San Juan, 00913, Puerto Rico, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 3.03717 BTC, net of potential subsequent new value, during the Preference Period.

44.     Defendant David Ratcliffe, with a personal or business address of Attn: David Ratcliffe, 60837 Willow Creek Loop, Bend, OR 97702, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.98441 BTC, net of potential subsequent new value, during the Preference Period.

45.     Defendant Dylan Garland, with a personal or business address of 4032 Hampstead Rd, La Canada, CA 91011, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.81540 BTC, net of potential subsequent new value, during the Preference Period.

46.     Defendant John Byrde, with a personal or business address of Attn: John Byrde, 104 Pinwheel Ct, Port St Joe, FL 32456, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.71976 BTC, net of potential subsequent new value, during the Preference Period.

-12-

47.     Defendant Guilherme Amado Cerqueira Gomes, with a personal or business address of Attn: Guilherme Amado Cerqueira Gomes, 28 Woodland Dr., Unit B, Greenwich, CT 06830, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.65458 BTC, net of potential subsequent new value, during the Preference Period.

48.     Defendant CRI Holdings, LLC, with a personal or business address of Attn: Brian Cameron, 2241 W Pine Dr, Prescott, AZ 86305, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.49448 BTC, net of potential subsequent new value, during the Preference Period.

49.     Defendant David Pera, with a personal or business address of Attn: David Pera, 238 St Andrews Way, Lompoc, CA 93436, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.45706 BTC, net of potential subsequent new value, during the Preference Period.

50.     Defendant Jonathan Towers, with a personal or business address of Attn: Jonathan Towers, 21381 Jeb Stuart Hwy, Damascus, VA 24236, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.20644 BTC, net of potential subsequent new value, during the Preference Period.

51.     Defendant Gustavo Santucho Brinkmann, with a personal or business address of Attn: Gustavo Santucho Brinkmann, Avda Cabildo, Avenida Del, Apto 2104 Ed Venetian Tower, Punta Del Este Uruguay, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.12877 BTC, net of potential subsequent new value, during the Preference Period.

52.     Defendant Mary Holtzman, with a personal or business address of Attn: Mary Holtzman, 10202 Saint Rene Rd, Louisville, KY 40299, was a customer of Integrator and an End-

User of Prime, and received transfers from Prime of 2.12234 BTC, net of potential subsequent new value, during the Preference Period.

53.    Defendant Brian Overly, with a personal or business address of 1603 South 219th Street, Elkhorn, NE 68022, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.04341 BTC, net of potential subsequent new value, during the Preference Period.

54.    Defendant Faris Mali, with a personal or business address of Attn: Faris Mali, 4 Sunnybank Rise, Marybank, Nelson 7010, New Zealand, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 2.00383 BTC, net of potential subsequent new value, during the Preference Period.

55.    Defendant Brian Jacob Bilnoski, with a personal or business address of 12269 Aviles Cir, Palm Beach Gardens, FL 33418, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.84377 BTC, net of potential subsequent new value, during the Preference Period.

56.    Defendant Zachary Hollinshead, with a personal or business address of 11045 84th St SE, Alto, MI 49302, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.81781 BTC, net of potential subsequent new value, during the Preference Period.

57.    Defendant Martin Saenz, with a personal or business address of Attn: Martin Saenz, 4803 Ancient Marble Drive, Sarasota, FL 34240, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.81162 BTC, net of potential subsequent new value, during the Preference Period.

58.     Defendant Roseberry Funeral Home, Inc., with a personal or business address of 512 Main Street, Friendship, WI 53934, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.79463 BTC, net of potential subsequent new value, during the Preference Period.

59.     Defendant Constance Aslinger Jacobs, with a personal or business address of Attn: Constance Jacobs, 823 Mission Ridge Rd, Rossville, GA 30741, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.77653 BTC, net of potential subsequent new value, during the Preference Period.

60.     Defendant David Strause, with a personal or business address of 3420 Royden Place, Charlotte, NC 28226, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.75519 BTC, net of potential subsequent new value, during the Preference Period.

61.     Defendant Reeran Kim, with a personal or business address of 6329 Rio Linda Drive, Rancho Palos Verdes, CA 90275, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.73013 BTC, net of potential subsequent new value, during the Preference Period.

62.     Defendant Daniel Clark, with a personal or business address of 317 Adelphi St # 2, Brooklyn, NY 11205, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.70735 BTC, net of potential subsequent new value, during the Preference Period.

63.     Defendant Fee, with a personal or business address of 3645 Calle Jazmin, Calabasas, CA 91302, was a customer of Integrator and an End-User of Prime, and received

transfers from Prime of 1.66369 BTC, net of potential subsequent new value, during the Preference Period.

64.    Defendant Shanthi Sivanandham, with a personal or business address of Attn: Shanthi Sivanandham, 1013 N Adams Rd, Birmingham, MI 48009, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.66010 BTC, net of potential subsequent new value, during the Preference Period.

65.    Defendant Randall Boll, with a personal or business address of 8516 Heirloom Boulevard, College Grove, TN 37046, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.59845 BTC, net of potential subsequent new value, during the Preference Period.

66.    Defendant Pavle Stojkovic, with a personal or business address of 1252A Pacific Avenue, San Francisco, CA 94109, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.56356 BTC, net of potential subsequent new value, during the Preference Period.

67.    Defendant Charles Avant, IV Miller, with a personal or business address of Attn: Charles Miller, 1124 Burgundy Street, New Orleans, LA 70116, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.55316 BTC, net of potential subsequent new value, during the Preference Period.

68.    Defendant KME LLC, with a personal or business address of Attn: Trenton Taylor, 16239 Oregon Ave, Bellflower, CA 90706, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.53107 BTC, net of potential subsequent new value, during the Preference Period.

69.    Defendant Aubyii Rekieh, with a personal or business address of Attn: Aubyii Rekieh, Qurum Heights, Way 2411 Muscat 116 Oman, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.48605 BTC, net of potential subsequent new value, during the Preference Period.

70.    Defendant Jason Todt, with a personal or business address of Attn: Jason Todt, 313 Cook Ave Apt 1, Chaffee, MO 63740, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.47512 BTC, net of potential subsequent new value, during the Preference Period.

71.    Defendant Darragh Monaghan, with a personal or business address of Attn: Darragh Monaghan, Unit 58, Bolanachi Building, Bermondsey England SE16 3SG, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.45298 BTC, net of potential subsequent new value, during the Preference Period.

72.    Defendant Block M Angels, LLC, with a personal or business address of 3454 Ellicott Center Drive, #204, Ellicott City, MD 21042, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.45206 BTC, net of potential subsequent new value, during the Preference Period.

73.    Defendant Brian Cameron, with a personal or business address of Attn: Brian Cameron, 2518 E Brown St, Phoenix, AZ 85028, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.42923 BTC, net of potential subsequent new value, during the Preference Period.

74.    Defendant Dr Louis Van Graan, with a personal or business address of 25 Cross Street, Lynton, Devon EX35 6HG, United Kingdom, was a customer of Integrator and an End-

User of Prime, and received transfers from Prime of 1.39072 BTC, net of potential subsequent new value, during the Preference Period.

75.     Defendant William Bartlett, with a personal or business address of 1107 Shoreline Drive, San Mateo, CA 94404, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.35736 BTC, net of potential subsequent new value, during the Preference Period.

76.     Defendant George Burguillos, with a personal or business address of Attn: George Burguillos, 2000 Dorado Beach Drive, Higuillar, Dorado 00646, Puerto Rico, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.33139 BTC, net of potential subsequent new value, during the Preference Period.

77.     Defendant Christopher Brugler, with a personal or business address of 5900 Center Drive # 657, Los Angeles, CA 90045, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.30682 BTC, net of potential subsequent new value, during the Preference Period.

78.     Defendant Jonathan Guez, with a personal or business address of 992 N Alpine Dr, Beverly Hills, CA 90210, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.21721 BTC, net of potential subsequent new value, during the Preference Period.

79.     Defendant Aldes Joseph Rozas III, with a personal or business address of 402 River View Drive, Jennings, LA 70546, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.19552 BTC, net of potential subsequent new value, during the Preference Period.

80.     Defendant Benjamin Koppenhoefer, with a personal or business address of 1749 SE 14th St., Fort Lauderdale, FL 33316, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.14714 BTC, net of potential subsequent new value, during the Preference Period.

81.     Defendant Kelly Inatomidebotoun, with a personal or business address of Attn: Kelly Inatomidebotoun, 7148 Gateshead Way, West Hills, CA, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.11821 BTC, net of potential subsequent new value, during the Preference Period.

82.     Defendant Downey Vendors Inc, with a personal or business address of 322 South Rossmore Avenue, Los Angeles, CA 90020, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.11040 BTC, net of potential subsequent new value, during the Preference Period.

83.     Defendant Daniel Johnson, with a personal or business address of Attn: Daniel Johnson, 2001 Steamboat Ridge Court, Port Orange, FL 32128, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.10000 BTC, net of potential subsequent new value, during the Preference Period.

84.     Defendant QuickieCoin NJ LLC, with a personal or business address of 301 Route 17 North, Suite 800 #12-40, Rutherford, NJ 07070, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.09530 BTC, net of potential subsequent new value, during the Preference Period.

85.     Defendant Ronald Williams, with a personal or business address of Attn: Ronald Warren, 1830 N Buffalo Dr Unit 2025, Las Vegas, NV 89128, was a customer of Integrator and

an End-User of Prime, and received transfers from Prime of 1.08078 BTC, net of potential subsequent new value, during the Preference Period.

86.     Defendant Dean Smith, with a personal or business address of Attn: Dean Smith, 106 Wet Feet Ct, Port St Joe, FL 32456, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.04810 BTC, net of potential subsequent new value, during the Preference Period.

87.     Defendant The Cody Harris Experience LLC., with a personal or business address of 212 E Beryl Ave, Salt Lake City, UT 84115, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.03537 BTC, net of potential subsequent new value, during the Preference Period.

88.     Defendant Timberland Holdings, LLC, with a personal or business address of Attn: Marcus Romanowski, 8222 Golden Oak Circle, Williamsville, NY 14221, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.03213 BTC, net of potential subsequent new value, during the Preference Period.

89.     Defendant Imperial Plaza, LLC, with a personal or business address of 15635 15875 SE 114th Ave, Clackamas, OR 97015, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.02856 BTC, net of potential subsequent new value, during the Preference Period.

90.     Defendant James Wikso, with a personal or business address of 11 Aldrich Ct., Bay Shore, NY 11706, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.01986 BTC, net of potential subsequent new value, during the Preference Period.

91.     Defendant Idalia Rychlik, with a personal or business address of Attn: Idalia Rychlik, 8102 Kentbury Dr, Bethesda, MD 20814, was a customer of Integrator and an End-User

of Prime, and received transfers from Prime of 1.01000 BTC, net of potential subsequent new value, during the Preference Period.

92.    Defendant Daniel Claps, with a personal or business address of 43 Hansom Road, Basking Ridge, NJ 07920, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.00062 BTC, net of potential subsequent new value, during the Preference Period.

93.    Defendant Linda Keller, with a personal or business address of 110 Suncrest Dr, Greenwood, IN 46143, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.00000 BTC, net of potential subsequent new value, during the Preference Period.

94.    Defendant Timothy Parker, with a personal or business address of The Cabins, Stokefield Farm, Pyrton England, OX49 5AT, United Kingdom, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 1.00000 BTC, net of potential subsequent new value, during the Preference Period.

95.    Defendant Mario Adrian Burdman, with a personal or business address of Dr Carlos Martinez Moreno 215, Colonia del Sacramento, 70000, Uruguay, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.97910 BTC, net of potential subsequent new value, during the Preference Period.

96.    Defendant Vann Walters, with a personal or business address of 1107 Baron Road, Waxhaw, NC 28173, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.94665 BTC, net of potential subsequent new value, during the Preference Period.

97.     Defendant Jared Kelly, with a personal or business address of 2451 Chicago Street, San Diego, CA 92110, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.93962 BTC, net of potential subsequent new value, during the Preference Period.

98.     Defendant Cranford Stoudemire, with a personal or business address of 125 East 12th Street, 4d, New York, NY 10003, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.93613 BTC, net of potential subsequent new value, during the Preference Period.

99.     Defendant Tucker Michael McGrath, with a personal or business address of 12523 Eagles Entry Dr, Odessa, FL 33556, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.93289 BTC, net of potential subsequent new value, during the Preference Period.

100.    Defendant Philip Herzog, with a personal or business address of 229 S. 126th St., Seattle, WA 98168, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.91726 BTC, net of potential subsequent new value, during the Preference Period.

101.    Defendant Elizabeth Parrish, with a personal or business address of 1609 Fulton Ave, Charlotte, NC 28205, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.91570 BTC, net of potential subsequent new value, during the Preference Period.

102.    Defendant Mykola Vrutsky, with a personal or business address of 12 Langeloth Dr, Cortlandt Manor, NY, 10567 was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.87 BTC, net of potential subsequent new value, during the Preference Period.

-22-

103.    Defendant Stephen Gray, with a personal or business address of 128 Majestic Dr, Mars, PA 16046, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.85 BTC, net of potential subsequent new value, during the Preference Period.

104.    Defendant Walter Patterson, with a personal or business address of 335 Encanada Dr, La Habra Hts, CA 90631, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.84 BTC, net of potential subsequent new value, during the Preference Period.

105.    Defendant James Noto, with a personal or business address of 8321 Canary Palm Ct, Sarasota, FL 34238, was a customer of Integrator and an End-User of Prime, and received transfers from Prime of 0.83 BTC, net of potential subsequent new value, during the Preference Period.

## JURISDICTION AND VENUE

106.    The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.* at §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

107.    This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

108.    In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

109.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

110.    This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

111.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. BTC and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

112.    All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called

"blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time. The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

113. There are many different blockchains. The first and most popular blockchain was the Bitcoin blockchain. Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, are referred to as "ERC-20" tokens.

114. Users generally hold crypto in digital wallets. On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys." These public keys are 40-digit alphanumeric strings. Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

115. "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address. Like public keys, private keys consist of multi-digit alphanumeric strings. However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

116. Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange. In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

117. Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

118.    A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

119.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



120.    Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

121.    Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

**I.    Prime's Business Operations**

122.    Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

123.    Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

124.    In the years that followed, as the crypto market grew, Prime shifted its focus away from traditional assets and towards the crypto industry.

125.    Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

126.    Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

-27-

127.    Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

128.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

129.    A significant number of Prime's customers were sophisticated crypto and digital asset companies that contracted with Prime through various contractual service-related agreements.  Prime referred to these customers as Integrators.  Integrators directly accessed services provided on Prime's platform through an API provided to the Integrator.

130.    Integrators also acted as integrators between their own respective customers (*i.e.*, the End-Users) and Prime, which allowed the End-Users to also utilize Prime's services.

131.    End-Users did not directly procure Prime's services, but, instead, accepted or agreed to the End-User Agreement with Prime that was presented to them by the Integrator through the Integrator's system.

## II.    Prime's Integrator and End-User Agreements Created a Debtor-Creditor Relationship Between Prime and its Customers

132.    In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "Objectors") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

133.    Integrators and End-Users originally transferred assets to Prime pursuant to either Integrator Agreements or End-User Agreements.

-28-

134.   The Court analyzed whether representative versions of Integrator Agreements and an End-User Agreement created a trust relationship between Prime and the Integrators and/or End-User.  The Court held that the agreements "submitted into evidence do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors."  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

135.   The relevant Integrator Agreements and End-User Agreements here, similar to the agreements addressed by the Court in the Distribution Opinion, do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors.

136.   Accordingly, Prime's relationship with its customers was a debtor-creditor relationship.

## III.   **The Preferential Transfers to Defendant**

### A.   **The Transfers**

137.   During the Preference Period, Prime transferred fiat and/or crypto to Defendant, by or on behalf of Integrator and/or End-User.  *See* Ex. B, Brennan Decl., ¶ 135.

138.   The specific Prime entity that made the Transfers to Defendant was Prime Trust, LLC.

139.   Exhibit 4 to the Brennan Declaration sets forth the amount of fiat and/or crypto transferred from Prime to Defendant, which is net of any potential subsequent new value that Defendant transferred to Prime during the Preference Period.  *See* Ex. B, Brennan Decl., Ex. 4.

140.   Thus, Defendant's preference exposure is no less than the amount of fiat and/or crypto alleged herein for Defendant.

### B.      The Transfers Are Avoidable

141.      Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

142.      First, the transfer must be "to or for the benefit of a creditor."  11 U.S.C. § 547(b)(1).

143.      Second, the transfer must be "for or account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

144.      Third, the transfer must have been "made while the debtor was insolvent."  11 U.S.C. § 547(b)(3).

145.      Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

146.      Fifth, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

147.      Prime made the Transfers to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime (*i.e.*, creditors of Prime).

148.      Prime made the Transfers on account of the antecedent debt Prime owed to Integrator or Integrator's customers which were End-Users of Prime through End-User Agreements by way of the debtor-creditor relationship created between those parties through Integrator's Integrator Agreements or End-User Agreements.

149.    Prime made the Transfers while it was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[9] Prime is nonetheless presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

150.    If not avoided, the Transfers would enable Integrator or one of Integrator's customers which was an End-User of Prime to receive more than they would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers.[10]

151.    Prime made the Transfers to Defendant during the 90-day Preference Period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023).

152.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Transfers even after taking into account potential affirmative defenses.[11]

153.    Accordingly, the Transfers to Defendant during the 90-day Preference Period immediately preceding the Petition Date were preferential transfers pursuant to section 547(b) of the Bankruptcy Code and are subject to avoidance.

---

[9]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc.*, (Case No. 23-11161) [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC*, (Case No. 23-11162), [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC*, (Case No. 23-11164) [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC*, (Case No. 23-11168) [Docket No. 178].

[10]   *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

[11]   It is Defendant's obligation to establish any affirmative defenses it asserts in this action, including any subsequent new value defense.

154.    The avoidable preferential Transfers are recoverable from each Defendant as either: (i) the initial transferee of such transfer or the entity for whose benefit the transfer was made; or (ii) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550.

155.    Thus, PCT may recover the Transfers, or the value thereof, from Defendant.

156.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Defendant during the Preference Period.  It is PCT's intention to avoid and recover all Preference Period transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Defendant or any other transferee.   PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Defendant's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint

## IV.    The Fiat and/or Crypto That Customers Transferred to Prime Is Not Traceable

### A.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

157.    The fiat that customers transferred to Prime was not segregated into separate bank accounts.  *See* Ex. B, Brennan Decl., ¶ 85.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat that other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id.*

158.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"). *See id.* at ¶ 12.  Prime maintained these bank accounts in its own name.

159.    Prime regularly transferred fiat between its various omnibus bank accounts, further commingling funds. *See id.* at ¶¶ 87–92.

160.    For example, Prime used one BMO account ("<u>BMO x3077</u>") primarily to make wire transfers. *See id.* at ¶ 89.

161.    BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers. *See id.* at ¶¶ 90–95.

162.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("<u>BMO x9934</u>"), because the latter account offered a higher rate of interest. *See id.* at ¶¶ 92.

163.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077. *See id.* at ¶ 93.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds. *Id.*

164.    In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature. *Id.*

165.    Prime's omnibus accounts at CRB and Signature operated in a largely similar manner as BMO x377—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers. *See id.* at ¶ 94.

166.    For instance, CRB account ("<u>CRB x9892</u>") and CRB account ("<u>CRB x4453</u>") were omnibus bank accounts at CRB utilized by Prime. *See id.* at ¶ 95.  These accounts were used primarily for internal transfers and payments via automated clearinghouse ("<u>ACH</u>"). *See id.*  Prime used BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH. *See id.*

167.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶¶ 88–89, 95.

168.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 98.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

169.    Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 87.

**B.    Prime Commingled Crypto in Omnibus Digital Wallets in Vaults**

170.    Similar to its handling of fiat, Prime did not maintain separate or segregated digital wallets for crypto.  *See id*. at ¶ 28.  Instead, Prime had omnibus digital wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes.  *See id.*

171.    Prime maintained its omnibus digital wallets in Prime's Vaults at Fireblocks, a third-party crypto security platform.  *See id.* at ¶ 29.  Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the omnibus digital wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls.  *See id*.  Vaults are Fireblocks were not separated or segregated by digital wallets.  *See id*.

172.    Customers were provided with deposit digital wallet addresses (the "Deposit Digital Addresses") for sending crypto to Prime.  *See id.* at ¶ 30.  From time to time, Prime would conduct "sweeps" of those different Deposit Digital Addresses to transfer crypto from those

Deposit Digital Addresses into one or more of the shared omnibus digital wallets controlled by Prime. *See id*. at ¶ 31. This process commingled crypto transferred to Prime by different customers together in the omnibus digital wallets. *See id*.

173.    Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id.* at ¶¶ 32–34. Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id*.

174.    Prime also regularly transferred crypto between its multiple omnibus digital wallets, only further commingling the already commingled crypto contained in the omnibus digital wallets. *See id.* at ¶ 33.

175.    In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to and from Prime on its Internal Ledger. *See id.* at ¶ 34. When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger. *See id*. The Internal Ledger, however, did not track to which omnibus digital wallet(s) any specific crypto was transferred into when Prime swept Deposit Digital Address(es). *See id*. at ¶ 35.

176.    When a customer requested to transfer crypto from Prime, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the outgoing transfer amount. *See id.* at ¶ 40. If the customer had transferred sufficient crypto, Prime would then check its multiple omnibus digital wallets to determine from which omnibus digital wallet(s) it could transfer the requested amount of crypto to the customer. *See id.* In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Digital Address because Prime's omnibus digital wallets did not segregate

-35-

crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer.  *See id.*

177.    To demonstrate the extent of Prime's commingling of crypto, the Brennan declaration discusses and illustrates examples of commingling taken from transaction, blockchain, and other data.  *See id.* at ¶¶ 41–84.

178.    For example, Prime often used the digital wallet with a digital address ending in ~73ck ("~73ck Wallet") for BTC transferred to Prime from numerous customers as well as BTC transferred from other Prime omnibus digital wallets, which also held BTC transferred to Prime by multiple customers.  *See id*. at ¶¶ 41–43.  This resulted in extensive commingling of BTC.



*See id*. at ¶ 54.

**C.      Prime Pooled Crypto to Reduce Transaction Fees**

179.    Prime generally swept crypto from the Deposit Digital Addresses into shared omnibus digital wallets to pool crypto together for a number of reasons.  *See id.* at ¶¶ 44–52.

180.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[12] that would otherwise be incurred by conducting transactions on the blockchain.  *See id.* at ¶¶ 64–67.  Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise incur transaction fees.  *See id*.  When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested as illustrated in the below diagram:

---

[12]   Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction.  However, on the Bitcoin blockchain, these are referred to simply as "transaction fees."  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain."  *See* Ex. B, Brennan Decl., ¶¶ 24–25.  We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein, but only use the term "gas fees" to refer to transaction fees incurred for ETH and USDT on the Ethereum network.



*See id.* at ¶¶ 67, 69.

181.    By sweeping BTC together that had been transferred to Prime by multiple customers, including certain Defendants named herein, Prime's commingling of BTC makes distinguishing the original digital wallet from which the BTC originated from nearly impossible. *See id.* at ¶ 72.

### D.    Prime Had Inadequate Reconciliation Processes

182.    Because Prime did not segregate the fiat and crypto transferred to it by one customer from the fiat and crypto transferred to it by another customer, or from the fiat or crypto generated by Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts owed on an Internal Ledger.  *See id.* at ¶ 86.

183.    However, Prime's inadequate internal cash management practices make identifying which bank account transfers corresponded with which specific customer fiat transactions reported on Prime's Internal Ledger extremely difficult.  *See id.* at ¶¶ 100–107.

184.    Likewise, because Prime did not conduct regular, timely or accurate reconciliations to compare the crypto recorded on its Internal Ledger with the crypto that Prime actually held in its omnibus digital wallets, none of the crypto in Prime's Vaults with Fireblocks has clear ownership provenance. *See id.* at ¶¶ 108–113.

185.    ███████████ ("█████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts of fiat or crypto that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ███████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

186.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger. *See* <u>Ex. B</u>, Brennan Decl., ¶¶ 100–113.  This further hindered the ability of Prime or anyone else to specifically identify which fiat or crypto had been transferred to Prime by which customer. *Id.*

187.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual. *See id.* at ¶ 103.

188.    Former Prime employees testified that Prime commingled fiat and crypto transferred to Prime by its customers and that Prime's reconciliation processes were poorly maintained.

189.    ████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

190.    ▅▅▅▅▅▅▅▅ ("▅▅▅▅"), Prime's former Chief Financial Officer, testified:

Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ▅▅▅▅▅▅▅, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

191.    ▅▅▅▅ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.* at 213:15–22.

192.    ▅▅▅▅ also testified about Prime's reconciliations processes both before and after March 2021:

Q:    When you say it was a problem, what do you mean?

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

▅▅▅▅ Dep., 19:23–20:5.

193.    ▅▅▅▅ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|---|---|---|---|---|---|---|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

194. The below testimony from ▮▮▮▮ demonstrates that Prime's regular practices of commingling assets and maintaining poor records resulted in Prime's own employees being incapable of determining exactly where assets transferred by a particular party were located:

Q:   And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:   It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:   And what does that mean to you, a client to have an omnibus account?

A:   It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:   And that was done at Prime Trust?

A:   It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

-41-

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

████ Dep., 205:19–207:3.

### E.    The Fiat and/or Crypto that Customers Transferred to Prime Cannot be Traced

195.    Prime's commingling of fiat and crypto in omnibus bank accounts and omnibus digital wallets, coupled with its poor recordkeeping procedures and, as detailed below, its eventual intentional falsification of internal records, make it impossible for PCT, Defendant, or anyone else to trace and specifically identify the fiat and/or crypto that any Prime customer originally transferred to Prime.  *See generally* Ex. B, Brennan Decl.

196.    The impossibility of tracing fiat and/or crypto that had been transferred to Prime by a customer already has been determined by the Court.  In its Distribution Opinion, dated July 18, 2025, the Court, after noting that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified," concluded that (1) "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that (2) "the fiat held by the Debtors is not traceable" and (3) "the hopeless commingling would not allow the cryptocurrency to be traced."  *See* Distribution Opinion at 23–24, 27, 30.

197.    For the reasons stated by the Court in its Distribution Opinion and alleged above, the fiat and/or crypto that customers transferred to Prime during the Preference Period is impossible to trace.

-42-

198.    Accordingly, the Transfers are avoidable and must be returned to PCT.

## V.    The 98f Wallet

### A.    Prime Discovers It Has Lost Access to the 98f Wallet

199.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime. *See* Ex. B., Brennan Decl., ¶ 115. Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time). *See id.* at ¶ 119.

200.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its omnibus digital wallets:

> ████@primetrust.com
>                                                   2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @████(s and @████ ████ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

201.    Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

202.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet. *See* Ex. B, Brennan Decl., ¶ 116.

203.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.

204.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ▮▮▮ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ▮▮▮ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords (called "seed phrases") that were associated with these physical hardware devices connected to the 98f Wallet.  *See id*.

205.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

**B.    Prime Uses Fiat From its Omnibus Bank Accounts to Purchase Replacement Crypto**

206.    Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a digital wallet containing a significant amount of crypto.

207.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests.  *See* Ex. B, Brennan Decl., ¶ 117.

208.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal requests as reflected in the chart below.  *See id.* at ¶ 119.

| Date | ETH On-Chain Transfers |
|------|------------------------|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |
| 1/21/2022 | 1,930.50 |
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

209.    The funds for each of these ETH purchases came from Prime's omnibus, commingled bank accounts.  *See id.* at ¶¶ 120–122.  The ETH purchased with those commingled funds was then transferred to Abra.  *See id.* at ¶ 52.

210.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ▮▮▮▮▮▮:

Q:    So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?

A:    I would defer to ▮▮▮ on that.  But essentially it was use of omnibus funds, is my understanding.

Q:    What's use of omnibus funds?

A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.

Q:    And which funds were used to make the purchases of the ETH to fund the transactions?

A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ▮▮▮ would know specifically.

-45-

Deposition of ▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

211.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.

**C.    Prime Corrupts and Falsifies its Internal Ledger in an Attempt to Conceal Its Use of the Omnibus Fiat**

212.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat from omnibus bank accounts to purchase ETH to satisfy Abra's outgoing transfer requests. *See id.* at ¶ 123.

213.    Prime executives discussed how to hide these transactions from auditors at Nevada FID:



214.　████ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider. *See* ████ Dep., 153:8–13.

215.　These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* <u>Ex. B</u>, Brennan Decl., ¶¶ 126–127.



216.　████ further testified about Prime's internal "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:　[T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:　Correct. Correct.

Q:　And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:　Correct . . .

Q:　I see. But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:　Exactly.

Q:　That's ultimately what happened; right?

A:　Yeah, that's exactly what happened.

███ Dep., 144:11–20, 146:7–15.

217.    ███ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Abra on Prime's Internal Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:

> Q:    And FID is Nevada Financial Institution Division; right?
>
> A:    I think so.  Yeah.
>
> Q:    And so, what is ███ talking about when he's saying "minimizing FID scrutiny during audit time"?
>
> A:    It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.
>
> Q:    So ███'s saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?
>
> A:    That's—that's what he was trying to do, yeah.

*Id*. at 152:18–153:13.

218.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* Ex. B, Brennan Decl., ¶¶ 128–130.

219.    As demonstrated by the illustrative chart below[13], Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

---

[13]    This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

*See id*. at ¶ 128.

220.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.  *See id.* at ¶ 129.

221.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries on its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally falsify Prime's internal records compounded the already impossible task of untangling or segregating the fiat and crypto transferred to Prime by different customers and the fiat and crypto that Prime generated from its business operations.  *See id*. at ¶ 132.

222.    Another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from Abra:



223.      ███ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ███████ ▇▇▇@primetrust.com> wrote:
>
> Hey ███
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

224.      ███████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":



On Wed, Dec 28, 2022 at 10:56 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

▮▮▮▮▮▮▮, and I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

## VI.  Prime's Financial Conditions Spiral Downward and Culminate in Its Filing the Chapter 11 Cases

225.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

226.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

227.    On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

228.    Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

229.    During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

230.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK

(Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/. CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

231.   On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order"). Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf. Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

232.   The next day, BitGo canceled its acquisition of Prime. One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

233.   On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023),

https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prim

e%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed

Prime to cease and desist all retail trust activities.  *Id.*

234.   The Nevada FID Petition also contained factual findings made by Nevada FID that

further corroborate the fact that Prime held fiat transferred to it from customers in commingled

accounts.

235.   Specifically, Nevada FID found that "P[rime] purchased additional digital currency

using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

236.   The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its

assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals."  *Id.*

at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its

clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)."  *Id.*

at 7.

237.   On July 14, 2023, the Nevada Court placed Prime under receivership.

238.   On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary

petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfer,
### 11 U.S.C. § 547(b)

239.   PCT repeats and re-alleges each and every allegation in the preceding paragraphs

as if set forth fully herein.

240.   Each of the Transfers to Defendant was a transfer of an interest in property of Prime.

241.    Prime made each of the Transfers to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime.

242.    At the time of the Transfers, Integrator and Integrator's customers were creditors of Prime within the meaning of section 101(10) of the Bankruptcy Code.

243.    The Transfers were made for or on account of an antecedent debt owed by Prime.

244.    The Transfers were made within ninety days of the Petition Date.

245.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

246.    If not avoided, the Transfers would enable Integrator or one of Integrator's customers which was an End-User of Prime to receive more than it would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

247.    Defendant has not repaid or returned any of the Transfers to PCT.

248.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses, including potential defenses under section 547(c) of the Bankruptcy Code, and believes the Transfers are avoidable.

249.    Accordingly, PCT is entitled to avoid the Transfers to Defendant identified, as to Defendant, in Exhibit B, Brennan Declaration, Exhibit 4, as a preference pursuant to section 547(b) of the Bankruptcy Code.

## Count II
## Recovery of Avoided Transfers from the Defendant,
## 11 U.S.C. § 550

250.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

251.    PCT is entitled to avoid the preferential Transfers described above pursuant to section 547(b) of the Bankruptcy Code.  Defendant was the initial transferee of such Transfer or the entity for whose benefit such transfer was made; or the immediate or mediate transferee of such initial transferee.

252.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Defendant the Transfers identified, as to Defendant, in Exhibit B, Brennan Declaration, Exhibit 4, as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## Count III
## Claim Objection, 11 U.S.C. § 502

253.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

254.    As alleged above, Defendant was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to section 547(b) of the Bankruptcy Code, which is recoverable from Defendant under section 550 of the Bankruptcy Code.

255.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Defendant that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Defendant pays PCT the value of the Transfers, for which and to the extent that the Court has determined Defendant is liable pursuant to section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.    Enter an order finding that the fiat and/or crypto Transfers addressed herein, and identified in Exhibit B, Brennan Declaration, Exhibit 4, are an avoidable preferential transfer under 11 U.S.C. § 547;

B.    Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfer alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, that were made to Defendant;

C.    Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Defendant against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Defendant relinquishes to PCT the amount ordered as an award for the avoidable transfers;

D.    Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.    Grant PCT all other relief, at law or equity, to which it may be entitled.

-56-

Dated:  August 14, 2025
        Wilmington, Delaware

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*